UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDY RAYBON,<br><br>        Plaintiff,<br><br>  v.<br><br>HARDY,<br><br>        Defendant. | No.  2:12-cv-01008-GEB-EFB<br><br>**ORDER DENYING CONTINUANCE MOTION AND SUPPLEMENTING PRETRIAL ORDER** |

        On February 11, 2016, Defendant Hardy filed an ex parte application under Local Rule 144(e) seeking to have a motion he filed to continue the trial date heard on shortened time. (Def.'s Ex Parte Appl., ECF No. 60.) Defendant seeks in the referenced motion to continue the trial date by one week, arguing "[g]ood cause exists under Rule 16" because two medical witnesses whom both parties intend to call at trial will be traveling abroad on the currently scheduled trial commencement date. (Def.'s Mot. 3:3-8, ECF No. 61.)

        Defendant's motion does not address nor show satisfaction of the legal standard applicable to the modification of a final pretrial order. See Fed. R. Civ. P. 16(e) ("The court may modify the order issued after a final pretrial conference only to prevent **manifest injustice.**" (emphasis added)). Also, Defendant's requested one week continuance is impractical because the Court has a criminal jury trial scheduled to commence on the

1

requested new trial commencement date. Therefore, Defendant's continuance motion is DENIED.

### OPPORTUNITY TO CONSENT TO TRIAL BY THE MAGISTRATE JUDGE

Should the parties timely, jointly consent to have the assigned Magistrate Judge preside over all matters in this case, including trial, with any appeal going directly to the Ninth Circuit, they may be able to obtain a different trial date from the Magistrate Judge. See 28 U.S.C. § 636(c)(1). The parties are "free to withhold consent without adverse substantive consequences." 28 U.S.C. § 636(c)(2); see also E.D. Cal. R. 305 (governing procedures for the disposition of civil actions on consent of the parties).

### SUPPLEMENT TO PRETRIAL ORDER

The July 21, 2015 Pretrial Order ("PO") is supplemented as follows:

**A.  Claim Preserved for Trial**

The PO evinces the following claim is preserved for trial.

1) Whether Defendant Hardy subjected Plaintiff to excessive force in violation of the Eighth Amendment by the manner in which Defendant applied tape on Plaintiff's waist on September 21, 2009, while Plaintiff was under contraband surveillance watch at Folsom State Prison. (PO 1:18-19, 3:23-26, 4:20-21, ECF No. 53.)

**B.  Trial Schedule**

Trial is currently scheduled to commence at 9:00 a.m. on March 22, 2016. Trial is held Tuesday, Wednesday, and Thursday of each week from 9:00 a.m. until approximately 4:30 p.m.

However, once the jury begins deliberating, the parties shall be available for communication with the jury Monday through Friday.

**C.  Proposed Statement of Undisputed Facts**

Attached is a proposed statement of undisputed facts to be read to the jury after the preliminary jury instructions are given. The attached undisputed facts were modeled after the statement of undisputed facts contained in the PO, with slight modifications. For example, abbreviations have been removed to avoid juror confusion. Neither party objected to the PO within the thirty days provided to do so. (See PO 11:26-2.) Therefore, the PO, as supplemented herein, is final.

**D.  Miscellaneous Provisions**

1.  Since it is evident that Defendant acted under color of law at all relevant times, this issue need not be presented to the jury.

2.  It is expected that Plaintiff will appear at trial seated at the counsel table with a leg restraint that is shielded from the jury's view by a fabric panel that runs from the bottom of counsel table close to the floor, and that Plaintiff will offer his testimony from the counsel table.

3.  Seven (7) jurors will be selected using the "struck jury" system. The struck jury system is "designed to allow both the [plaintiff] and the defen[dant] a maximum number of peremptory challenges. The venire . . . start[s] with about [18] potential jurors, from which the [plaintiff] and the [defendant] alternate[] with strikes until a petite panel of [seven] jurors remain[s]." Powers v Ohio, 499 U.S. 400, 404-05 (1991); see also United States v. Esparza-Gonzalez, 422 F.3d 897,

899 (9th Cir. 2005) (discussing the "struck jury" system).

The Jury Administrator randomly selects potential jurors and places their names on a list that will be provided to each party in the numerical sequence in which they were randomly selected. Each juror will be placed in his or her randomly-selected seat. The first randomly selected juror will be in jury seat number one, which is at the extreme right-hand side of the jury box in the top row as the jury box is viewed from the well of the courtroom. The eighth juror will be in the eighth seat. The ninth selected juror will occupy the seat located at the extreme right-hand side of the jury box in the bottom row. The fifteenth seat will be in the left-hand side of that row. Three chairs will be placed in front of the jury box. The sixteenth juror will occupy the seat on the right and the eighteenth juror will occupy the seat on the left. The first seven jurors on a list, which shall be given to counsel, will constitute the petit jury unless one or more of those seven is excused for some reason. Assuming that the first and fifth jurors on the list are excused, the second listed juror becomes the first, and the other jurors' numbers are changed accordingly, with the ninth juror on the list becoming seventh on the list; however, the jurors continue to be identified by their original numbers.

    4.    The judge may conduct all voir dire or may authorize each side fifteen minutes for additional voir dire. If the judge conducts all voir dire, the judge will ask, "Does a party have additional input?" If a party responds, "Yes," that party shall give the Courtroom Deputy that party's written question or questions.

1       Following voir dire questioning, each party shall take
2  turns exercising his three allotted peremptory strikes. The
3  parties will be given a sheet of paper ("strike sheet") upon
4  which they shall silently exercise their peremptory strikes,
5  commencing with Plaintiff, by passing the strike sheet back and
6  forth until all peremptory challenges are used or waived. If a
7  party elects to pass rather than exercise a particular peremptory
8  challenge, that party shall write the word "pass" for that
9  challenge, and that challenge is waived.[1]

10       5.  The trial will be conducted in two phases:
11  liability and punitive damages. If the jury finds in favor of
12  Plaintiff on his excessive force claim, trial on punitive damages
13  (both liability and the amount of punitive damages) will
14  immediately follow.

15       6.  When the judge is conducting voir dire, the
16  following will be stated to the venire:

> This is a civil lawsuit filed by the Plaintiff against the Defendant. The Plaintiff is representing himself, which means that, in addition to his role as the Plaintiff, he is acting as his own attorney during the trial.
>
> The lawsuit concerns when Plaintiff was a state prisoner housed at Folsom State Prison, and when Defendant was on the correctional staff at that prison.
>
> For period of time in that prison, Plaintiff was under contraband surveillance watch, which is reserved for inmates believed to have swallowed contraband or hidden it in

---

[1] See United States v. Esparza-Gonzalez, 422 F.3d 897, 899 (9th Cir. 2005) (discussing waiver of peremptory challenges in "struck jury system"); see generally United States v. Yepiz, 685 F.3d 840, 845-46 (9th Cir. 2012) (indicating "'use it or lose it' voir dire practice" is authorized if "the composition of the panel" does not change).

5

their body cavities. Inmates on contraband surveillance watch have the legs and waist of their boxer shorts, and the arms and legs of their jumpsuits, taped closed to prevent them from accessing their body waste and disposing of or further concealing contraband.

Plaintiff alleges Defendant subjected him to excessive force in violation of the Eighth Amendment to the United States Constitution by the manner in which Defendant applied tape on Plaintiff's waist.

Defendant denies Plaintiff's allegation.

Neither party need give an opening statement since in a prior pro se prisoner trial, it was evident that an opening statement caused the plaintiff to be confused about the nature of the trial proceeding, and sufficient information will be provided to the jury about the trial. Further, each party's closing argument for the first phase of trial may not exceed forty-five (45) minutes. Plaintiff may decide how to allocate his total time for closing argument between his opening and rebuttal arguments.[2]

If a second phase of trial is needed to determine whether to award and the amount of punitive damages, each side is limited to ten (10) minutes for closing argument on punitive damages.

IT IS SO ORDERED.

Dated: February 12, 2016

GARLAND E. BURRELL, JR.
Senior United States District Judge

---

[2] See United States v. Patterson, 678 F.2d 774, 781 (9th Cir. 1982) (discussing the district court's discretion in limiting the length of closing arguments).

6

**UNDISPUTED FACTS**

A court order issued before this trial that determined the following facts concerning this case are undisputed. Therefore, you should treat each of the following facts as having been proved.

Plaintiff Goldy Raybon is properly in the custody of the California Department of Corrections and Rehabilitation.

Plaintiff was housed at Folsom State Prison at all times relevant to this case.

On Saturday, September 19, 2009, Plaintiff was placed on contraband surveillance watch because he was suspected of hiding contraband in his rectum.

Contraband surveillance watch is reserved for inmates believed to have swallowed contraband or hidden it in their body cavities.

Inmates on contraband surveillance watch must pass three recorded bowel movements that are contraband-free before they can be removed from contraband surveillance watch.

While on contraband surveillance watch, inmates are kept under direct and constant visual surveillance.

Contraband surveillance watch inmates are checked by correctional and medical personnel frequently, and they are

1

given meals, snacks, and drinks regularly to help facilitate bowel movements.

Upon entering contraband surveillance watch, inmates are given pairs of socks, two sets of boxer shorts, and two sets of jumpsuits.

Inmates on contraband surveillance watch have the legs and waist of their boxer shorts, and the arms and legs of their jumpsuits, taped closed to prevent them from accessing their body waste and disposing of or further concealing contraband.

Inmates on contraband surveillance watch are kept in waist restraints with handcuffs and leg restraints.

Cells designated for contraband surveillance watch do not have showers or flushing toilets because of the possibility that contraband may be recovered and discarded.

Contraband surveillance watch inmates must contact staff when they need to urinate or defecate.

A portable toilet and toilet paper is provided when the inmate needs to defecate, and a plastic urinal device is provided when he needs to urinate. The amount of urine expelled is measured and recorded by correctional officers, and the feces is searched to locate possible contraband.

When Plaintiff was put on contraband surveillance watch on September 19, 2009, he was given a new pair of socks, two pairs of boxer shorts (one facing forward and the other

backward), and two jumpsuits (one facing forward and the other backward).

Before putting the first jumpsuit on, correctional officers taped Plaintiff's boxers around his thighs and waist.

After that, Plaintiff put the first jumpsuit on, and correctional officers taped his ankles, thighs, waist, arms, and wrists.

After that, Plaintiff put the second jumpsuit on, and officers taped his ankles, thighs, waist, arms, and wrists again.

Officers then applied mechanical restraints around Plaintiff's ankles, and waist restraints around his mid-section, and they placed him in handcuffs that were connected to the waist restraints.

A correctional officer was stationed right outside Plaintiff's cell the entire time he was on contraband surveillance watch.

When Plaintiff needed to relieve himself, he told the officer outside his cell, and the officer then notified the sergeant.

After the sergeant was notified that Plaintiff had to relieve himself, two or three officers went to Plaintiff's cell, undid all of the tape around Plaintiff's clothes, removed the

mechanical restraints around his waist, and provided him with a urinal for urination or a portable toilet for defecation.

On average, it takes about fifteen minutes from the moment an inmate on contraband surveillance watch asks to relieve himself to the time his restraints are replaced and he is put back in his cell.

On September 21, 2009, at 5:10 p.m., Plaintiff was removed from his cell. Plaintiff urinated after he was removed from his cell, and after that, his jumpsuits were replaced, his tape was re-applied by Defendant Hardy, and his vital signs were checked.

Plaintiff's vital signs were checked again at 8:00 p.m. At 8:30 p.m., a nurse took Plaintiff to the Treatment and Triage Area after he complained of shortness of breath.

Plaintiff did not tell the nurse why he was experiencing shortness of breath.

Dr. Reddy evaluated Plaintiff at the Treatment and Triage Area at approximately 9:10 p.m.

Plaintiff's chief complaint to Dr. Reddy was shortness of breath, but he did not mention Defendant Hardy or say that Hardy (or any other officer) applied his waist restraints too tight.

Plaintiff was alert and oriented during Dr. Reddy's evaluation, and his blood pressure, pulse, and oxygen saturation levels were normal and stable.

Dr. Reddy determined that there were no clear medical indications to send Plaintiff for emergency care outside of the Treatment and Triage Area because Plaintiff was clinically stable.

Plaintiff was released from the Treatment and Triage Area and sent back to his contraband surveillance watch cell about twenty minutes after Dr. Reddy evaluated him.